Filed 1/3/14  In re H.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re H.M. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | F067284 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 516080 & 516081) |
| v. | **OPINION** |
| K.C., | |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*]     Before Cornell, Acting P.J., Detjen, J. and Franson, J.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

K.C. (mother) appeals from an order terminating parental rights (Welf. & Inst. Code, [1] § 366.26) to her sons H.M. and E.F. (collectively, the boys). Mother contends the juvenile court erred in finding no beneficial parent-child or sibling relationship existed to prevent termination of her parental rights. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In August 2010, the Stanislaus County Community Services Agency (agency) received a referral that mother used methamphetamine in front of her then 16-year-old daughter C.C.,[2] six-year-old H.M., and five-year-old E.F. The referral further alleged that mother was not paying rent or utilities, she had not purchased food for the home, she was a hoarder, and the children were filthy due to lack of bathing. The agency took custody of the three children and initiated dependency proceedings in April 2011, after mother failed to engage in the voluntary family maintenance services offered by the agency. At this time, the boys' father was deceased and, C.C.'s father did not have room for her in his residence and agreed to her being placed in foster care.

In May 2011, the juvenile court exercised jurisdiction over the boys pursuant to section 300, subdivision (b), finding true allegations that mother—a longtime methamphetamine user with a child welfare history—was not compliant with her voluntary family maintenance case plan, did not maintain a safe and hazard-free home for the children, and failed to enroll the children in school. Mother also neglected the

---

[1]    All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    C.C., who turned 18 during the proceedings, opted to move back in with mother and was not subject to the juvenile court's jurisdiction when it terminated mother's parental rights to the boys.

2.

children's hygiene and failed to provide them with adequate medical and dental care, as a result of which the boys suffered from severe body odor and rotting teeth. The boys were placed together in a foster home and mother was offered reunification services. C.C. was initially placed in the same home as the boys but was moved to another placement in early November 2011.

At the time of the 6-month and 12-month review hearings, mother was visiting the boys regularly and consistently. In his reports, the social worker assigned to the case commended mother's diligent efforts to complete her case plan and noted the existence of a strong bond between mother and her children.

By the time of the 18-month review hearing, however, the social worker was recommending that the juvenile court terminate mother's reunification services and set a section 366.26 hearing. In late September 2012, the social worker reported mother had relapsed twice and it had become apparent that, without a structured drug and alcohol program in which she was consistently monitored, she would continue to struggle with drug addiction and relapses. The social worker concluded there was no reasonable expectation mother would be able to resolve the issues that led to the boys' removal even if she were provided additional services.

In the September 2012 report, the social worker further noted that mother continued to be consistent in attending supervised visits at least once a week at the agency's office and he had "no doubt" mother had "a strong bond" with her children.

In early December 2012, the social worker filed a report reflecting that, beginning on October 9, mother missed six of approximately 10 scheduled supervised visits with the boys. The boys' foster parents (the prospective adoptive parents), with whom the boys were placed in August 2012, reported that mother had become inconsistent in her telephone calls to the boys and had been leaving visits early. In addition, mother had failed to attend any of the boys' school conferences or medical appointments.

At the conclusion of the 18-month review hearing on December 19, 2012, the juvenile court terminated mother's reunification services and set a section 366.26 hearing. The court suspended mother's educational rights and assigned them to the boys' foster parents. The court also ordered a bonding study to assess the quality of the bond between mother and the boys.

The bonding study, dated April 8, 2013, was conducted by licensed psychologist Cheryl Carmichael, Ph.D. In conducting the study, Dr. Carmichael interviewed mother on February 4, 2013. In Dr. Carmichael's opinion, mother had no insight into how her behavior might have a negative effect on the boys. Mother claimed neither of the boys had benefited from their current placement. Mother was angry about the surgical removal of the boys' teeth, claiming a doctor had told her the level of rot was not a problem. Mother believed the boys should be returned to her immediately for their own good and stated she might "die" if they were not.

Dr. Carmichael interviewed the boys' foster parents on February 5, 2013. They reported that when the boys first came to their family, they lacked social skills and exhibited immature behavior, poor sleeping habits, and complete disregard for any organization or boundaries. The boys also suffered from swollen and bleeding gums, rotten teeth, and a great deal of pain. One of the first things the foster parents did was take the boys for a dental consultation, a consequence of which the boys had dental surgery under general anesthesia in September 2012.

According to the foster parents, the boys had adjusted well to living within their family. The boys were developing better manners, lashed out less frequently, and sought out the adults for attention and affection. They were also more cooperative and worked better with the other children in the home. Because they had significant educational needs, the boys needed and received more adult attention within the family. Because the other children in the household were independent and stable, there was no fight for attention.

The foster parents reported that the boys looked forward to visits with mother and sister C.C. The boys had a connection with mother. They liked her and enjoyed playing with her. But the boys looked to their foster parents for support for school, social activities, and problems. The boys did not notice or were only momentarily irritated by mother's inconsistent phone calls and visits. They had no problem leaving visits with mother and transitioning back to their lives with their foster family.

On February 20, 2013, Dr. Carmichael observed a supervised visit at the agency between mother, C.C., and the boys. The visit occurred outdoors in a play area. Dr. Carmichael described it as "a delightful playtime with all four of them interacting" until H.M. lost his glasses. Dr. Carmichael explained:

> "[Mother] became upset, demanded play stop to search for the glasses in the lawn. It took the boys a few seconds to react to her intensity but their reaction was clear. They stopped and both looked very frightened.… The glasses were found and they were broken. [Mother's] reaction was negative and [she] chastised the boys that she would be in trouble because the glasses were broken.…"

After the incident of the broken glasses, mother took the boys to a picnic table where the boys continued to play, running and climbing on the table. Mother tried to get the boys to finish a snack and calm down, but they were not very responsive. Soon the foster mother arrived with her son. The boys immediately engaged their foster brother and ran to a play structure, while mother and the foster mother discussed the broken glasses. Shortly thereafter, the boys and their foster brother "piled in the waiting car and took off with nary a glance backwards."

On March 26, 2013, Dr. Carmichael observed the boys with their foster parents at her office. In the waiting room, the boys played quietly on the floor or brought books to their foster father to read. The boys immediately cleaned up and came to the psychologist's office when called. The boys' interaction with their foster parents was entirely different from their interaction with mother. They answered questions, asked for

5.

help, asked permission to play with toys, and laughed with each other and the adults. The boys were physically affectionate and enthusiastic about their lives with their foster parents. The foster family had exposed the boys to many leisure activities that were perfect for their interests and development.

Dr. Carmichael concluded that, while mother and the boys did have a bond, their relationship was "best characterized as playmates." Dr. Carmichael observed the boys enjoyed playing with mother during visits but did "not respond to her efforts to guide them, calm them, [and] feed them." Instead, the boys would "ignore her or look scared." On the other hand, the boys responded to their foster parents and foster brother "with ease, cooperation and affection" and looked to their foster parents for "attention, care, direction, and guidance."

Dr. Carmichael observed that the boys had "ongoing educational and behavioral needs" which were being addressed by the foster parents. The foster parents "work[ed] closely with educators, medical professionals and counselors to help the boys catch up and maximize their potential." In contrast, mother had "vehemently disagreed with the medical and dental interventions, was invited to all school meetings but did not attend and is unfamiliar with the known educational needs and progress of her children."

Dr. Carmichael concluded it was in the boys' best interests for them to be adopted by their current foster parents and "there would be no or limited detriment to the boys i[f] their visits with their mother were terminated."

The agency's report for the section 366.26 hearing indicated that, since the 18-month review hearing, mother had been consistent in coming to the agency's office for her twice monthly visits. During the visits, the boys had also been able to visit with their sister C.C.

The social worker concluded it was in the boys' best interest to terminate parental rights, noting mother had relapsed twice in her drug treatment programs, continued to indulge in drugs, and failed to take responsibility for having the boys seen by medical,

6.

dental, and vision professionals. The social worker observed the boys were now happier and having all their needs addressed by the foster parents.

The delivered services log attached to the report reflected that, on March 20, 2013, the foster parents informed the social worker that mother spoke with the boys on the telephone every day. During their conversations, mother would tell the boys they would be coming home and that it was the social worker's fault they were not with her. As a result, the boys did not like the social worker.

On May 6, 2013, the section 366.26 hearing commenced. During the hearing, mother's counsel examined H.M. in chambers.[3] H.M. testified he loved mother, liked his visits with her, and wished he could live with her. During visits, he played with mother and talked to her about how he was doing well in school. He would feel sad if he could never see mother again and agreed he wanted to continue visiting with her.

H.M. liked living with his foster family. They let him talk on the phone with mother every day and he looked forward to those phone calls. H.M. also got to see his big sister, C.C., when he visited mother. He felt sad about C.C. because he wanted to see her more often. He would play soccer with C.C. during visits. He would feel sad if he could not see C.C. anymore.

Although he liked where he was living, H.M. did not want to stay there. However, he was not sure why he did not want to stay there. They were nice to him. If he had to stay there, he would like to continue visiting mother and C.C. and talking to them on the phone. He loved his mother and sister and felt sad when he thought about not seeing them anymore.

---

[3]     The juvenile court would not permit E.F. to be questioned because, after asking the young boy several questions, the court expressed doubt that E.F. knew the difference between telling the truth and telling a lie.

C.C. testified that she went with mother to visit the boys every other week. During visits, they had snacks and would go outside and play. The boys were affectionate towards C.C. and mother during visits. They would ask C.C. for help during visits, including asking her to take them to the bathroom or move objects around the play area. At various times, C.C. had heard both boys say they wanted to go home with mother. The boys would mope and have sad expressions at the end of visits. However, it also seemed the boys had started "to get a bit more distant" now that they were not visiting or communicating as much.

C.C. testified that mother always interacted with the boys during visits. They played a lot together and she would ask them about school and their after-school activities like karate class and soccer. During visits, mother set rules the boys would follow and occasionally put them in a "time out" if they did not listen to her.

C.C. wanted an opportunity to maintain her sibling relationship with the boys. She believed it would likely "devastate" the boys if they were not able to see her and mother. It has been getting harder and harder for the boys to leave them at the end of visits.

Mother testified she was close to the boys and had a good relationship with them. On visits, she would bring snacks and activities and they would all play together. Mother would ask the boys about school and their after-school activities. She praised the boys when she learned from their foster mother they were doing well in school. She also attended an "IEP meeting" and school events at the end of the previous school year when the boys were in kindergarten. The boys were affectionate towards her during visits and looked sad when the visits ended.

Mother talked to the boys every day on the phone. Lately, it seemed like E.F. was "shutting himself off." He would just make a few statements, including that he loved her, and then give the phone back to the foster mother. H.M. would sometimes tell mother about problems he was having in his daily life. For example, H.M. had a bully at school,

and mother told him to tell his teacher. When mother inquired about it later, H.M. told her he had told his teacher and the bullying had stopped.

Mother believed it would be detrimental to the boys to terminate her relationship with them because their father had died recently, and it would be difficult to lose their mother right after that.

After listening to closing arguments on May 9, 2013, the juvenile court adopted the agency's recommendations and terminated parental rights.

## *DISCUSSION*

Mother contends the juvenile court erred when it terminated her parental rights to the boys. Specifically, she challenges the sufficiency of the evidence to support the juvenile court's findings that the beneficial parent-child relationship exception and the sibling relationship exception to adoption and termination of parental rights did not apply. We disagree and affirm.

Section 366.26, subdivision (c)(1)(B) acknowledges termination may be detrimental to a dependent child under specifically designated and compelling circumstances. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).) One of those circumstances is when a parent has maintained regular visitation and contact and the child would benefit from continuing the relationship to such a degree that the child would be greatly harmed by termination. (§ 366.26, subd. (c)(1)(B)(i); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); "beneficial relationship exception.") Another of those exceptional circumstances is where termination would cause a substantial interference with the sibling relationship. If so, the trial court must consider the nature of the sibling relationship and go on to balance any benefit, emotional or otherwise, the child would obtain from ongoing contact with the sibling against the benefit of legal permanence the child would obtain through adoption. (§ 366.26, subd. (c)(1)(B)(v); see *In re L.Y.L* (2002) 101 Cal.App.4th 942, 949; "sibling relationship exception.".)

A finding that termination would not be detrimental, however, is not a prerequisite to the termination of parental rights. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347.) The statutory presumption is that termination and permanency through adoption is in the child's best interests and therefore not detrimental. (§ 366.26, subd. (b); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1344.) A party opposed to termination bears the burden of showing that termination would be detrimental under one of the statutory exceptions. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)

In its ruling terminating parental rights, the juvenile court expressly found the beneficial parent-child relationship and sibling relationship exceptions to termination of parental rights and adoption did not apply. Under any standard of review, the court's finding is proper because mother did not meet her heavy burden of establishing that termination of her rights would be detrimental to the boys. (*Celine R.*, *supra*, 32 Cal.4th at p. 62.) Regardless of whether there exists a strong parent-child relationship or a sibling relationship, the court's analysis of a detriment claim does not stop there. Mother must also show that a continued parent-child or sibling relationship is so beneficial to the boys that at least one of those relationships outweighs the benefits the boys would receive through a permanent plan of adoption. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 949; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

In this case, there was no evidence that the boys would benefit from continuing the parent-child or sibling relationship to such a degree that it would outweigh the benefits to them of being adopted. Mother claims this weighing process is problematic because the benefits of adoption cannot be measured while "[n]umerous psychological studies show that under circumstances where there is at least one surviving parent adoption carries with it lifelong scars, and feelings of abandonment." Her argument ignores the law. Children have compelling rights to a placement that is stable, permanent, and allows the caretaker to make a full emotional commitment to the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.)

10.

In this case, the benefits of adoption were readily apparent. The boys had significant needs (behavioral, dental, educational, etc.), due to mother's severe neglect, which the prospective adoptive parents immediately set about addressing with positive results. Further support for the juvenile court's findings was provided by the April 2013 bonding study, which concluded that adoption and termination of parental rights was in the boys' best interests. Mother challenges the sufficiency of the bonding study on the grounds Dr. Carmichael only observed the boys interact with mother and C.C. for a short period of time, and failed to obtain information about the boys' feelings about mother, including how they felt about not seeing her again. Mother's criticisms of the bonding study amount to nothing more than an invitation for this court to reweigh the bonding study's worth in the decisionmaking process. That is not our function as a reviewing court. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.)

Mother's evidence failed to establish that the benefit of continuing contact with her or the boys' sister, C.C., would outweigh the benefits of adoption. Although visits with mother were loving and pleasant, there was also evidence mother engaged in self-centered and emotionally manipulative behaviors, such as suggesting to the boys that they would be returning to her custody even though she admittedly knew this was not the case. In light of mother's defiant attitude regarding these behaviors at the section 366.26 hearing, there is reason to believe they would persist if she were permitted to have continuing contact with the boys and that such behaviors would interfere with the boys' ability to make a positive attachment with their caretakers. Moreover, the law does not support mother's assertion that "[the boys'] sadness at the prospect of losing [their] sister must be sufficient evidence of detriment under the sibling relationship exception … such that it outweighs the benefit of adoption." (See *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952 [mother did not sustain her burden of proof that termination of parental rights would substantially interfere with the sibling relationship where there was no evidence the minor, other than being sad, would suffer detriment if the relationship ended ].)

11.

On this record, there is no compelling evidence that ongoing parent-child or sibling contact was in the boys' best interests so as to outweigh the benefit of permanency they would gain through adoption. We therefore conclude the juvenile court acted properly in rejecting mother's arguments and terminating parental rights.

## *DISPOSITION*

The order terminating parental rights is affirmed.